**Robert E. BRADLEY, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 4:05–cv–668 RWP–TJS.**

United States District Court, S.D. Iowa, Central Division.

Nov. 10, 2006.

Robert J. Engler, Schulte Hahn Swanson Engler & Gordon, Burlington, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, Chief Judge.

Plaintiff, Robert E. Bradley, filed a Complaint in this Court on December 15, 2005, seeking review of the Commissioner's decision to deny his claims for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

## PROCEDURAL BACKGROUND

Plaintiff filed applications for Social Security Disability benefits on October 16, 2003, claiming to be disabled since February 1, 2003. Tr. at 54–56 & 276–78. Plaintiff, whose date of birth is May 4, 1950, was 54 at the time of the hearing in March 2005. Tr. at 300. Plaintiff was last insured to receive Title II benefits at the end of December, 2005. Tr. at 69. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on March 30, 2005. Tr. at 295–331. The ALJ issued a Notice Of Decision—Unfavorable on July 13, 2005. Tr. at 17–25. The Appeals Council declined to review the ALJ's decision on November 15, 2005 (Tr. at 5–7), making the ALJ's decision the final decision of the Commissioner. Tr. at 5. Plaintiff filed a Complaint in this Court on December 15, 2005.

Following the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. At the second step the ALJ found that Plaintiff's severe impairments are, "History of left kidney hydronephrosis, hypertension, and history of right kidney multicystic disease." The ALJ found that none of these impairments qualify for benefits at the third step of the sequential evaluation. Tr. at 24. At the fourth step, the ALJ found that Plaintiff has the residual functional capacity for sedentary work as defined at 20 C.F.R. § 404.1567(a). The ALJ found that Plaintiff had the residual functional capacity to perform his past relevant work as a telephone solicitor. The ALJ found that Plaintiff is neither disabled nor entitled to the benefits for which he applied. Tr. at 25.

## SUMMARY OF THE EVIDENCE

Plaintiff was seen at the University of Iowa Hospitals and Clinics on October 9, 2003. Plaintiff had first gone to an emergency room where he was found to have a massive right-sided dilated kidney which was thought due to a congenital condition. Tr. at 165. Plaintiff underwent a lateral cystoscopy with left, retrograde pyelogram and attempted stent placement on the day of admission. Tr. at 169. Plaintiff was discharged on October 11, 2003 in stable condition, without any pain. The diag-

noses on discharge were 1) obstructive uropathy secondary to left distal ureter strictures, status post left nephrostomy tube placement, and 2) right multicystic dysplastic kidney. Tr. at 163–64. On October 27, 2003, Plaintiff was seen at the University by Bernard Fallon, M.D. and David A. Anderson, M.D. for a follow up examination, at which time he appeared to be doing well. Tr. at 162. Plaintiff was asymptomatic when he was seen by Howard N. Winfield, M.D. and Dr. Anderson on October 31, 2003. On November 4, 2003, Plaintiff underwent laparoscopic left pelvic lymph node disection. Both the pre and post operative diagnoses were left ureteral obstruction due to pelvic lymphadenopathy versus mass. Tr. at 156. When Plaintiff was seen on November 10, 2003, Dr. Fallon wrote that Plaintiff was feeling well, doing well, and had no major complaints. Tr. at 155. On December 2, 2003, Plaintiff reported that he was feeling very well, having no significant problems with his nephrostomy tube, and was beginning to urinate normally. Tr. at 153. On January 1, 2004, Plaintiff underwent an antegrade pyelogram which demonstrated excellent and rapid contrast medium transporting to the bladder. It was felt that the obstruction in Plaintiff's ureter had been relieved. Tr. at 152.

On May 25, 2004, Plaintiff saw Charles F. Eddingfield, M.D., for a disability physical. Plaintiff, who was 54 years old at the time of the examination, stated that his major problem was rheumatoid arthritis in his right knee. Plaintiff said this had been diagnosed at the University of Iowa on the basis of blood tests. Plaintiff said that he had difficulty walking, especially on hard concrete surfaces. Plaintiff also related his history of kidney problems. Finally, Plaintiff told the doctor that at age 17, he fractured his right leg and hip resulting in the placement of rods in his leg. Tr. at 185. The doctor asked Plaintiff if he was depressed and he said he was, but he would not answer whether or not he has seen a psychiatrist. On physical examination, the doctor found Plaintiff's right leg was 1 cm shorter than the left leg. Tr. at 186. After a physical examination, the doctor made 15 diagnoses among which were painful swollen right knee, and right elbow swelling. The doctor's 15th diagnosis was depression. Tr. at 187. The doctor opined:

I think that he can probably routinely lift ten pounds and carry this for a distance of ten feet but because of his right knee being painful he should not carry this more than fifteen minutes out of every hour of an eight hour working day. I do not think that he should carry any weight up and down steps and probably should only go up and down steps once every three hours. He should not be climbing ladders, stooping, kneeling, or crawling because of his right knee which is painful.

The doctor wrote that Plaintiff's hypertension was very severe and should be actively treated because it was "getting into the dangerous range." Tr. at 188.

On June 9, 2004, Kiran Khanolkar, M.D., Plaintiff's primary physician, wrote a "To Whom It May Concern" letter with a list of conditions in Plaintiff's medical history. The right side of the letter did not copy correctly, but the list includes osteoarthritis of his [right] knee, the history of renal failure, hypertension, glaucoma, hypercholesterolemia, and history of right hip fracture repair at age 15. Tr. at 192. The doctor's office notes follow. Tr. at 193–236.

On August 9, 2004, Plaintiff saw licensed psychologist Patrick Ewing, M.S. for a mental status examination. Tr. at 237–42. During the examination, Plaintiff displayed significant difficulty with concentration. Mr. Ewing found no evidence to suggest a history of perceptual problems, and Plain-

tiff had no difficulty remembering events from the recent and remote past. Plaintiff denied suicidal ideation. Tr. at 238. Plaintiff identified depression as a problem, but did not endorse symptoms consistent with depression. Plaintiff's primary medical complaints were his kidney condition and arthritis. He reported that because of his kidneys, he is unable to take any prescription or nonprescription medication "on a regular basis" to relieve his arthritis pain. Tr. at 239. Plaintiff reported difficulty sleeping due to arthritis pain, and the need for frequent urination due to his kidney problem. Plaintiff reported that he is an ordained minister in his church. Plaintiff told the psychologist that he had a number of jobs, including factory work. Plaintiff had operated a restaurant for a time, and also businesses such as car detailing, and managing a family fun center. Tr. at 240. It did not appear as though Plaintiff had ever pastored a church, although he was a minister. When asked about typical days, Plaintiff reported that his night time sleep was frequently interrupted with pain and the need to urinate. He said that he took as many as five to seven short naps throughout the day. Under the heading Summary and Impressions, Mr. Ewing remarked on Plaintiff's obvious difficulties with mobility due to arthritis. "He complains of constant fatigue due to his inability to sleep and due to the underlying kidney dysfunction." Although Plaintiff did not endorse symptoms consistent with depression, "it is likely that he is faced with a bereavement process in coming to terms with a loss of energy and stamina associated with his medical problems." Finally, Mr. Ewing wrote: "He describes himself as having a varied and successful career in a number of different positions and expresses an interest in continuing these activities. However, he is unable to sustain the physical energy necessary." Tr. at 242.

On January 1, 2005, Plaintiff underwent a functional capacity evaluation by physical therapists Genevive Grant–Blindt, P.T.A., and Helen J. Anderson, P.T. Tr. at 264–75. In the final report, addressed to Dr. Khanolkar, the therapists stated that during the testing, Plaintiff demonstrated a willing and competitive attitude toward the testing and that there was no indication of sub-maximal effort. Nevertheless, Plaintiff was capable of no more than sedentary physical activities, and his sitting tolerance was "markedly limited." Tr. at 264.

At the hearing on March 30, 2005, Plaintiff testified that he was 54 years old, and that he had graduated from highschool. Tr. at 300. Plaintiff testified that his wife had received a Three hundred Thirty thousand dollar settlement from Phen-fen litigation but had spent it all paying bills and putting their children through college, and that she was receiving SSI disability benefits. Tr. at 301.

Plaintiff testified that he was unable to work because of arthritis, high blood pressure, and kidney problems. He testified to pain in various joints in his back, knees and feet. Tr. at 303. Plaintiff said that he is able to take Tylenol, but no other medication because of his kidneys. Tr. at 304. Plaintiff also said that the doctors told him that because he only has one functional kidney, he must take the Tylenol no more often than necessary: "Dr. Khanolkar told me, but I can't even take them on a consistent basis. I have to be sporadic with it because of the danger of the kidney." Tr. at 307.

When Plaintiff was testifying about his past relevant work, he was asked if he had ever worked as a telephone solicitor which the vocational expert had listed on the past relevant work summary (Tr. at 138). He said that he had never worked as a phone solicitor. He testified that between March (Tr. at 313) and September (Tr. at 311) of

2002, he phoned people to see if they wanted a brand of air conditioning. If they did, he would go to their home to take the measurements. This required crawling under the homes, and through crawl spaces. He said he was not able to do that. Tr. at 311. The ALJ inquired how he was able to do that work through 2000, 2001, and 2002. Plaintiff maintained that if he had written that on any form, it was in error. Tr. at 313. Plaintiff testified:

I've worked all of my life, since I was a boy. When you get into my work record—I've set pins in a bowling alley in 1958 when I was eight years old, from 4:00 to midnight. And I went to school every day. I worked all of my life. I worked in a janitorial service when I was 16 years old until I was able to work in the steel foundry pouring metal from 9:30 at night to 6:00 in the morning. I'm not use to this. I'm not use to not being able to do what I want to do. It's very, very heartbreaking. It's very, very depressing. I look you eyeball to eyeball and tell you that. If I could walk out this door right now and forget about the disability and go to work, I'd love it. I'm 54 years old, and you take me back to eight years old from working all the way up to 54 year old, that's how many years I've worked already in my life.

Tr. at 322.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 326. The vocational expert was asked to identify Plaintiff's past work which was sedentary. She named telephone solicitor, the manager of the recreational facility, general sales representative finding investors, and selling advertising. Tr. at 326–27. The vocational expert went on to testify that sedentary work requires the ability to sit for 30 minutes at a time. If a person is not able to sit that long, than the range of work is "greatly eroded." Tr. at 330.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

In the case at bar, Plaintiff is a 55 year old man who has severe kidney problems. One kidney functions poorly and the other does not function at all. In addition, when Plaintiff was 15 years old, he fractured his right hip, and still suffers pain from that injury. Plaintiff has osteoarthritis in his right knee. Because of his kidneys, he is unable to tolerate pain medication which might otherwise be available to ameliorate his pain. Plaintiff began his working ca-

reer before he was in high school, from which he graduated, and during which he participated in athletics. Plaintiff's working career included years working in a foundry pouring molten metal. When economic conditions turned down, Plaintiff worked as a handyman and house painter, and he attempted to engage in business selling heating and air conditioners. Finally, when his kidney condition deteriorated, he had to stop working and, contrary to his deeply ingrained pattern of hard work, he applied for disability benefits.

Proceeding through the sequential evaluation used to evaluate a Social Security Disability claim, Plaintiff clearly established his case through the first two steps. He does not dispute the fact that he does not qualify at the third step. At the fourth step, it is Plaintiff's burden to prove that he does not have the residual functional capacity to do his past relevant work. A residual functional capacity must be supported by some medical evidence. Plaintiff went to his primary care physician, who arranged a functional capacity evaluation by a physical therapist.

Anyone who has experience reading functional capacity evaluation reports knows that physical therapists are sensitive to those who would put forth less than maximum effort. *See e.g. Baker v. Barnhart*, 457 F.3d 882, 886 (8th Cir.2006)("The FCE includes multiple evaluations designed to produce an objective measure of the patient's effort and cooperation with the goal of the test.") In *Baker*, the Functional Capacity Evaluation showed results usually consistent with voluntary submaximal effort. Patients who score as Baker did, "are felt to be attempting to control the test results to demonstrate a greater level of disability than what is actually present ..." *Id.*

In Plaintiff's case the therapists reported that Plaintiff demonstrated a willing and competitive attitude towards the testing and there was no indication of submaximal effort. Several times during the evaluation, Plaintiff needed to be stopped because of the obvious physical distress the task caused. *See* Tr. at 270. The evaluation showed that Plaintiff was limited to sedentary levels of lifting, but that his ability to sit was "markedly limited."

No one will accuse Plaintiff of being unwilling to work. Competitive work, however, requires more than a willing spirit. Even the most sedentary of jobs requires the ability to sit and attend to work duties without interruptions from medically determinable impairments. In *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir. 1980), the Court, quoting case law going back to the 1960s, wrote that the mere theoretical ability to engage in substantial gainful activity is not enough if there is no reasonable opportunity. The Court, quoting *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir.1965), wrote:

> The criteria to be considered in determining a claimant's ability or inability to engage in substantial gainful activity, for purposes of determining his right to social security disability benefits, are objective medical facts, diagnoses, and expert medical opinions of subsidiary questions of fact, subjective evidence of pain and disability testified to by claimant, and claimant's educational background, work history and present age.

The Court went to hold that for benefits to be denied, it must be shown that the claimant can *realistically* perform in existing employment. The Secretary of Health and Human Services failed to show that Rhines could work, and the Commissioner of Social Security has failed to show that Plaintiff in this case can work. The finding that Plaintiff can return to his past relevant work is not supported by substantial evidence on the record as a whole.

In *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote:

> Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

In the case at bar, Plaintiff proved his impairments and limitations with medical and vocational evidence. At the hearing, the vocational expert testified that if a person is unable to sit for extended periods of time, sedentary work is not possible. Given the fact that Plaintiff is unable to do his past relevant work which includes sedentary work, all that remains is for his benefits to be calculated and awarded. This case is remanded to the Commissioner for that sole purpose.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for payment of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[1]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

1. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."