Kevin D. RICE, Plaintiff,

v.

Michael J. ASTRUE [1], Commissioner of Social Security, Defendant.

No. 3:06–CV–26 RWP–TJS.

United States District Court, S.D. Iowa, Davenport Division.

Aug. 16, 2007.

---

1. Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Maureen McGuire U.S. Attorney's Office, Des Moines, IA, for Defendant.

Robert J. Engler, Schulte Hahn Swanson Engler & Gordon, Burlington, IA, for Plaintiff.

## ORDER

PRATT, Chief Judge.

Plaintiff, Kevin D. Rice, filed a Complaint in this Court on March 10, 2006, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for Social Security Disability benefits on January 6, 2003. Tr. at 152–55. The Court is without jurisdiction to review any of the prior applications in this record. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977). Plaintiff's date of birth is March 9, 1959. Tr. at 153. At all times relevant to this decision, Plaintiff was classified as a younger individual for Social Security purposes. 20 C.F.R. § 404.1564. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on April 20, 2005. Tr. at 35–70. The ALJ issued a Notice Of Decision—Unfavorable on July 28, 2005. Tr. at 17–26. On January 20, 2006, the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner in this case. Tr. at 11–13. Plaintiff filed his Complaint in this Court on March 10, 2006.

In her decision, the ALJ found Plaintiff had never engaged in substantial gainful activity. Tr. at 24. The ALJ found that Plaintiff has severe impairments consisting of fracture of the left leg status post rod placement, obesity, arthritis, carpal tunnel

syndrome and low intellectual functioning. The ALJ found that the impairments do not meet or equal one listed in Appendix 1, Subpart P, Regulations No. 4. (the listings). The ALJ found that Plaintiff has a residual functional capacity for sedentary work, with limited reading and writing and with the ability to do simple, routine, repetitive work, at a regular pace. The ALJ found that there is unskilled work which Plaintiff is capable of performing. Examples of the jobs were assembler of buttons, hand packager, and surveillance system monitor. Tr. at 25. The ALJ found that Plaintiff was not disabled or entitled to the benefits for which he applied. Tr. at 26.

At the hearing of April 20, 2005, the ALJ set forth a statement of the case to that point:

> Mr. Rice, you know why we're here today. You filed an application for Supplemental Security Income benefits in January [2003]. Now, you had previously been on disability benefits, my understanding is, in 1981, Administrative Law Judge Donald Starr [phonic] awarded you benefits, and then, in 1983, Administrative Law Judge Dorsey ceased your benefits. Then, in June of '87, DDS found you disabled. In September of '97, your disability continued, and then ultimately, it was determined in December of 2001 that you no longer met the listings that were in effect in 1987, and you were ceased in April of 2002. Is that correct?

Tr. at 37. Plaintiff agreed that instead of appealing the cessation, he filed the new application in January of 2003. Tr. at 38.

On May 11, 1978, Plaintiff was involved in a motorcycle accident in which he sustained a right lower leg laceration, closed left femur fracture, open midshaft tib-fib fracture, laceration of the left foot and heel and bilateral medial malleoli fractures. Plaintiff underwent surgery at the University of Iowa Hospitals and Clinics. Tr. at 284. The Court has read the subsequent medical history, but will concentrate on the medical records during the relevant period of time.

On February 7, 2003, Plaintiff was seen at Great River Medical Center in West Burlington, Iowa because of cellulitis in his left leg. A ultrasound of the leg was ordered. No evidence for deep venous thrombosis was found. Plaintiff was prescribed antibiotics and advised to use warm packs on his leg and to elevate it. Tr. at 499–500. Plaintiff was seen again at the emergency room on August 7, 2003 for another episode of cellulitis. Tr. at 497.

On February 12, 2003, Plaintiff was seen by Nidal Alkurdy, M.D. at the Burlington Neurology & Sleep Clinic, at the request of Disability Determination Services. Tr. at 463–67. Plaintiff complained of swelling in his legs which was increased with walking, and shortness of breath. Tr. at 463. On physical examination, Plaintiff weighed 300 pounds at 5 feet, 9 inches tall. The doctor noted atrophy of the left leg with extensive scarring from the thigh down to the ankle. After the remainder of the examination (Tr. at 464), the doctor opined that Plaintiff, then 43 years old, would have difficulty standing and walking for 8 hours per day. The doctor said Plaintiff should be able to lift "average weight." "He should have no problem moving about and sitting in an 8 hour work day." Tr. at 465

On July 2, 2003, Plaintiff was seen for a psychological evaluation by School Psychologist Richard Heiniger, Ed.S. Tr. at 477–81. On the Wechsler Adult Intelligence Scale–Third Edition (WAIS–III), Plaintiff scored a Verbal IQ of 63, a Performance IQ of 75, and a Full Scale IQ of 65. Tr. at 480. The psychologist opined that the Verbal IQ score reflected a lowered estimate of Plaintiff's cognitive abili-

ties because of behaviors during the testing. "During the administration of the verbal scale subtests, Kevin frequently exhibited lengthy pauses before responding and many times he either remained motionless and silent or he would move his head from side to side." After the testing was completed, the psychologist engaged Plaintiff in conversation and "the quality of some of his responses seemed richer and appeared to be in contrast to most of those provided on the WAIS–III verbal scale subtests." Tr. at 477.

Plaintiff was seen at the University of Iowa Hospitals and Clinics on December 3, 2003, for complaints of left tennis elbow, left shoulder pain, and neck pain. Tr. at 740. After a physical examination (Tr. at 742), Plaintiff was diagnosed with carpal tunnel syndrome for which he was given a cock-up splint. Plaintiff was also diagnosed with epicondylitis for which physical therapy was recommended. He was also given a prescription for Peroxycam. Plaintiff was given an injection of lidocaine into the AC joint. Tr. at 743.

Plaintiff was admitted to Great River Medical Center on March 6, 2004. Plaintiff complained of pain in his right leg and noticed redness. On examination, his right calf was red from the ankle to just below the knee. The leg was hot and tender. This initial diagnosis was cellulitis. Plaintiff was given antibiotics both orally and intravenously. Tr. at 553–54. When he was discharged on March 10, 2004, Plaintiff was stable and the swelling had significantly decreased. During the hospitalization, it was determined that Plaintiff did not have diabetes, but that he should be monitored for decreased glucose tolerance. Tr. at 520.

On June 10, 2004, Plaintiff underwent a left carpal tunnel release at the University of Iowa Hospitals and Clinics. When he returned on June 21, 2004, Plaintiff reported complete resolution of nocturnal symptoms and daytime paresthesias in his left hand. Tr. at 726.

On April 19, 2005, counsel wrote to the ALJ asking that a residual functional capacity form be admitted into the record. The form had been completed by Dr. Martin Ruzek, who was Plaintiff's treating physician since September 2003 (see Tr. at 636–717). Tr. at 718. The doctor stated: Plaintiff's pain would interfere with his ability to pay attention and to concentrate; that Plaintiff would be capable of "low stress jobs"; would not be able to walk the length of a block without rest or severe pain; would be able to sit for 15 minutes; stand 5 minutes; could sit, stand, walk less than 2 hours per day; needs to use a cane or other assistive device to stand or walk; could "rarely" lift less than 10 pounds; could rarely look down, turn head to right or left, look up, and could occasionally hold head in static position; could never climb ladders, and rarely climb stairs; has significant limitations reaching, handling or fingering; and has more than 4 days per month when he would likely be absent from work as a result of his impairments. Tr. at 719–24.

At the hearing, Plaintiff testified that he quit school in the 9th grade because he wasn't "getting along." After quitting school, he did odd jobs such as cutting grass and making cheese bait at a bait shop. For four months in 1978, Plaintiff worked at a motorcycle shop. Tr. at 41. He testified that he is not able to read. He said that while in school, he was in special education classes.

Plaintiff said that Dr. Ruzak was his treating physician. Tr. at 42. Plaintiff said that the doctors at the University of Iowa had done surgery on his left hand because it was worse than the right. He said that surgery on the right hand will be done when financial issues are resolved. Tr. at 43.

Plaintiff testified that his weight was 370 or 380 pounds, "something like that." Tr. at 45. He said that he was 100 pounds heavier than in 2002. He said that he gained weight when he had bouts of cellulitis. Tr. at 46. Plaintiff said that he has cellulitis once or twice each year. Tr. at 55.

Plaintiff said that he still has a lot of pain in his leg because the skin is glued to the bone. Tr. at 50. Plaintiff said that pain in his neck and back makes it difficult to sit longer than an hour. Tr. at 51. He said that he can only stand for 10 or 15 minutes at a time. He said that if he walks for a block he is out of breath and has pain in his ankle. Tr. at 52.

Plaintiff testified that he was using the CPAP machine to sleep. He said that when he had lost weight, he got by without it, but needed to use it again. He said that with the machine he was able to sleep for 6 or 8 hours through the night. Tr. at 53.

Plaintiff testified that if he does dishes or cooks, he puts a chair by the sink or stove and sits to do the activity. Tr. at 55. He said that his sisters do the shopping for him and his mother. Tr. at 56. He also said that his sisters do his house work and his laundry. Tr. at 57.

Plaintiff was asked why he felt he can't work.

> Because I really can't do much. I mean, I'm—I've, you know, walked around, and when I am on my feet, you know, too long, then the next day, I can't even walk on my, you know, bad leg. The ankle and the leg itself hurts, you know, after a bad workout. I mean, I have to hang onto the walls to, just to get out of my, you know, to walk a little bit.

Tr. at 59.

The ALJ asked Plaintiff about his inability to read. She asked how he was able to know the difference in the bills he received. Tr. at 61. He responded that he is able to recognize the design of the various bills.

After Plaintiff testified, the ALJ directed counsel to pose the first hypothetical question to the vocational expert:

> If you have a man who's 46 years old, has an eighth grade education, is unable to read, and only does additions as far as math goes. He walks with a cane. He can lift a maximum of 10 pounds, and less than 10 pounds frequently. He can sit for up to one hour at a time, but can only sit for up to two hours out of an eight hour workday, can stand and walk for a total of two hours out of an eight hour workday, and only can stand for a maximum of 10 to 15 minutes at a time, and can walk for about one block. He can't kneel or stoop, and infrequently should use the steps. Is there any work in the national economy which would be available to a person with that hypothetical?

Tr. at 64–65.

The vocational expert responded that the inability to sit for more than two hours, combined with the other limitations, would preclude all competitive employment. Tr. at 65.

The ALJ asked Plaintiff how he spends his time if he is only able to sit for two hours per day. Plaintiff responds that he spends the majority of his days in bed. Tr. at 66. The ALJ asked if his doctors wanted Plaintiff to stay in bed all day, and he admitted that they want him "get, you know, moving. But I just didn't, you know, got it in me, I mean, for the arthritis and that. I mean, I'm stiff, stumped over all the time." Thereafter, the ALJ asked the vocational expert if there are sedentary, unskilled jobs which would allow for occasional walking. The vocational expert cited jobs such as assembler of buttons

and notions, hand packager, and surveillance system monitor. Tr. at 67–68.

## DISCUSSION

Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart,* 457 F.3d 882 (8th Cir.2006.); *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000). Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart,* 465 F.3d 881 (8th Cir.2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart,* 457 F.3d 742, 746 (8th Cir. 2006). We will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Consequently, we may not reverse the decision to deny benefits unless the record contains insufficient evidence to support the outcome. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir. 1994). *Nicola v. Astrue,* 480 F.3d 885, 886–87 (8th Cir.2007.)

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

In this case, the ALJ proceeded to the fifth step of the sequential evaluation to find Plaintiff is not disabled. In the opinion of the Court, the ALJ did not give adequate consideration to whether or not Plaintiff should have prevailed at the third step of the sequential evaluation. A remand is necessary in this case to further develop the record on two very important points: 1) whether Plaintiff's obesity, in combination with his musculoskeletal impairment meets or equals listing 1.01; or, 2) whether Plaintiff's IQ meets or equals listing 12.05 C.

In the case at bar, the ALJ wrote that she considered Plaintiff's claim pursuant to SSR 02–1p. SSR is shorthand for Social Security Ruling. This Ruling was published after the obesity listing was eliminated. In the introduction, the Ruling states the listing 9.09 was eliminated not because obesity could not be disabling, but because the listing did not adequately represent a degree of functional limitation that would prevent an individual from engaging in substantial gainful activity. Nevertheless, changes in the listings were made to ensure that obesity is addressed in the listings, particularly those involving the musculoskeletal, respiratory, and cardiovascular body systems.

■ Here, it is clear that the ALJ did not give adequate consideration to the effect of Plaintiff's obesity on his ability to walk, stand and sit. In this regard, the record is not adequately developed so that the Court can say with certainty that Plaintiff does or does not meet or equal a listed impairment. Before a hearing on remand, the Court encourages counsel as well as the ALJ to very carefully re-read SSR 02–1p.

■ On remand, the ALJ should also give further consideration to Plaintiff's IQ. Although the ALJ was well within the bounds of reasonable choice to reject the low verbal IQ demonstrated by Plaintiff during the testing by the school psychologist, further effort should have been made to ascertain his true level of intelligence. Plaintiff's highest scores were in the performance scales, and here he scored a

performance IQ of 75. Given the total evidence in this record, it is unlikely that Plaintiff's verbal IQ will be higher than, or even as high as, his performance IQ. Plaintiff completed the 8th grade, albeit in special education, without learning how to read or write. In *Shontos v. Barnhart*, 322 F.3d 532, 537–38 (8th Cir.2003), the Court noted that an IQ slightly higher than necessary to meet the listing—60 to 70—may equal the listing. While the evidence in this case may or may not support such a conclusion, on remand, that issue must be fully and fairly developed.

In *Christner v. Astrue*, 498 F.3d 790, 793, 2007 WL 2324335, *3 (8th Cir.2007), the Court quoting *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir.2006) wrote: "[T]he *[Maresh]* panel held there was sufficient evidence that the claimant's mental retardation manifested before age twenty-two, as inferred from Maresh's struggles in special education classes through the ninth grade." Therefore, if it found that Plaintiff's verbal IQ is between 60 and 70, or if it is only slightly higher than 70, the impairment clearly manifested itself before Plaintiff was twenty-two years old.

Finally, if the case again proceeds to step five of the sequential evaluation, adequate consideration must be given to the effect of Plaintiff's obesity and his diminished intelligence on his residual functional capacity.

### CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for further proceedings consistent with this opinion.

The judgment to be entered will trigger the running of the time in which to file an

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the gov-

application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

ernment in the case that the applicant alleges were not substantially justified."