Judy A. SILK, Plaintiff,

v.

Michael J. ASTRUE [1], Commissioner of Social Security, Defendant.

No. 4:06–CV–183 RWP–TJS.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 31, 2007.

Gary L Hayward, United States Attorney, Des Moines, for Commissioner of Social Security, Defendant.

Timothy N Tripp, Tripp, P.C., Pella, for Judy A Silk, Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Judy A. Silk, filed a Complaint in this Court on April 19, 2006, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

The case was previously before the Court captioned *Barnard v. Barnhart,* 4:03–cv–90697, filed December 3, 2003.

1. Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On August 18, 2004, the Commissioner moved to reverse and remand. Clerk's 15. Although Plaintiff resisted (Clerk's 17), the Court granted the motion on October 7, 2004. Clerk's 18. Defendant's motion is in the record of the case sub judice at 573–75. The Court's Order of remand is in the record at 577–81.

On December 16, 2005, following the remand, an administrative hearing was held. Tr. at 629–660. Plaintiff, a medical expert, and a vocational expert testified. The ALJ made the following opening statement setting forth the history of the case as she saw it:

We had a hearing back in June of 03 which seems like a millennium ago because it's almost two years ago. We issued a decision in August of 03, that decision was affirmed by the Appeals Counsel (sic) at Exhibit 8B (Tr. at 7–9), let's get the date on that, Notice of the Appeals Counsel (sic) November 22, 2003. The case was then appealed to the District Court at 11B (Tr. at 576) and 12B (Tr. at 577–81). The District Court using all kinds of cases from other District Courts that are not presidential (sic) using seventh circuit case law which is not presidential (sic) in the eighth circuit, decided in cahoots or collusion with the General Counsel that this case should be remanded. And so we're here today based on a remand order and the remand order indicates that we should give further consideration to your mental health problems and toward that end we have Dr. Pomerantz here to testify.

Tr. at 631. During the hearing, Plaintiff amended her application to ask for a closed period of disability beginning August 7, 2001, through May 26, 2004. Tr. at 645.

On October 2, 2001, Nancy Vander Broek, D.O., one of Plaintiff's treating physicians since 1993, wrote to a disability examiner at Disability Determination Services. The doctor wrote that she had treated Plaintiff since 1993, and that Plaintiff had "battled depression for numerous years." Treatment consisted of Prozac, Risperdal, and occasionally Trazodone. The doctor noted that Plaintiff sought frequent counseling at Pine Rest Counseling. The doctor wrote: "She has marked difficulty maintaining gainful employment. . . . When her depression is active, she would have difficulty maintaining attention, concentration, and pace." Tr. at 231.

On March 5, 2002, Plaintiff's psychiatrist, Monte L. Bernhagen, M.D., wrote a report for Plaintiff's attorney. The doctor stated that Plaintiff was his patient since 1999. Plaintiff's diagnoses were dysthymia, borderline personality disorder and occasional major depressive episodes "in the form of double depression." The doctor wrote: "While the depression is episodic, she has an underlying dysthymia that is quite chronic in nature and seems to be exacerbated by stress in her environment. Judy has had significant difficulty maintaining employment for lengthy periods of time, and it is my opinion that Judy is not able to maintain or sustain gainful employment." Tr. at 266. The treatment records from Pine Rest Christian Mental Health Services are in the record at pages 267–341, 381–95, 403–20, 434–43, 609–28, all of which were reviewed by the Court.

Plaintiff saw Allan E. Peterson, M.D. on April 23, 2002, for a physical examination. Plaintiff told Dr. Peterson that she was seeking disability for problems with her mental health. She told the doctor that she is able to walk for about 30 minutes, although standing tends to make her right knee hurt. She said that she could lift about 10 pounds. She said that she could sit without problems. On physical examination, Plaintiff was noted to be 61 inches tall, with a weight of 257 pounds. Tr. at 365. Dr. Peterson recommended obtain-

ing a statement from Dr. Bernhagen regarding the severity of Plaintiff's dysthymia. Tr. at 366.

Dr. Bernhagen wrote to Plaintiff's attorney on August 14, 2002 in which he repeated his March assertions. The doctor wrote: "It is my opinion that because of Judy's mental illness and personality disorder that she is not able to maintain and sustain full-time employment. I do not feel that she can work eight hours per day, five days per week, 12 months at a time." The doctor also wrote: "It is my opinion that Judy is not able to maintain employment. I do believe she would have difficulty in virtually any work setting, and I agree with her decision to seek out disability benefits." Tr. at 379. In a letter dated November 26, 2002, Dr. Bernhagn wrote that Plaintiff had undergone gastric bypass surgery. "This is a very significant procedure with a long recovery time and requires strict regimentation in her diet. This in turn adds a large amount of stress in her daily routine. This in turn feeds into her depression and anxiety, and I do believe that she has a tremendous risk in exacerbation of her mental health issues. Judy has a very fragile ego structure. She becomes suicidal very quickly, and I am concerned for her safety." Tr. at 396.

On April 28, 2003, Dr. Bernhagen wrote that he continued to treat Plaintiff for her mental illnesses and that "it is my opinion that Judy remains at best in a stable condition at this time." The doctor wrote that Plaintiff suffers from anhedonia or a pervasive loss of interest in almost all activities. He wrote: "Judy has a constant decreased energy, constant feelings of worthlessness, and occasional thoughts of suicide. She does have a history of paranoia and delusions. Judy has never experienced manic episodes, to the best of my knowledge." The doctor continued by stating that Plaintiff's symptoms cause: a marked restriction in her abilities to main-

tain social functioning; impairment in some activities of daily living; marked difficulties in the ability to maintain concentration, persistence or pace, especially in a worked setting, evidence by multiple episodes of decompensation and inability to maintain and sustain employment. Tr. at 426. Dr. Bernhagen concluded his report:

I should note that in the past I have mentioned Judy's condition as stable. By this I mean that she is not suicidal and is able to function fairly well independently. However, I do believe that if Judy were forced to seek employment and work in a full-time setting that this would be detrimental to her well-being and would exacerbate all of her mental impairments to the point where she may actually need long-term hospitalization. I do believe that her symptoms interfere frequently and her ability to concentrate and pay attention. I do not believe that she would be able to perform an 8–hour workday without unscheduled breaks. She has evidence of not being able to get along well with co-workers and supervisors, and when she does receive constructive criticism, it becomes quite detrimental to her, often requiring medication adjustments and extra hours in therapy.

Tr. at 427.

Dr. Bernhagen wrote directly to the ALJ on June 2, 2003. The doctor stated that Plaintiff had been a patient at Pine Rest Christian Mental Health Services since July 6, 1999. Her diagnoses were dysthymia, major depressive disorder and borderline personality. The doctor stated that Plaintiff had also had psychotic features with delusions. He said there was also a strong anxiety component. At the time of his letter, Plaintiff was hospitalized for severe depression with suicidal features. The doctor wrote that he also wanted to address issues which had been

brought to his attention regarding the case. Dr. Bernhagen wrote:

> One area of concern was in regard to information contained in the narrative reports vs. my clinical notes. When a patient is seen for a 15–minute med check or for a med check with brief therapy, I try to obtain information from that patient's previous visit until the current point and time. In Judy's case, I saw her either monthly or every two weeks, sometimes more frequently depending on how she was doing. If she is fairly stable in between visits, the clinic note should reflect this. If she is unstable and having significant difficulties, that should be reflected as well. However, when I write a narrative report, this is usually a brief overview of the nature and severity of my patient's impairment over a much longer period of time and not simply a snapshot of Judy's condition of any given day.
>
> When reviewing the Global Assessment of Functioning score, I place more emphasis on the suicidality component of the score as opposed to the patient's ability to maintain employment. This is particularly important in patients such as Judy as she is frequently suicidal. If Judy has a period of time that she is not contemplating suicide, her GAF scores would tend to be higher even though she is not capable of maintaining employment. I understand that this can cause some confusion when other people read the GAF score. Therefore, in the future I will make an attempt to include more criteria in my determination. But again in cases such as Judy's, my primary focus has been maintaining her safety and keeping her alive compared to maintaining employment.

Dr. Bernhagen concluded his letter by explaining that clinical notes, do not always list all the DSM–IV TR criteria. After the thorough evaluation which is made at the initial interview, the treatment notes contain "clinical shorthand" which may reflect one or two items with which the patient is having particular difficulty. Tr. at 444–45.

Plaintiff underwent a psychological evaluation by Phil T. Porter, M.A., a licensed psychologist on August 2, 2006. Tr. at 602–04. Plaintiff was identified as a 51 year old recently married woman. Mr. Porter noted Plaintiff's well documented history of inpatient and outpatient treatment for mental illness. Plaintiff described her depression as ongoing, with times when she feels overwhelmed and experiences an incapacity for work or personal care. Mr. Porter administered a mental status examination, the Minnesota Multiphasic Personality Inventory—2, and the Beck Depression Inventory. Tr. at 602. The Beck Inventory score suggested minimal depression at the time of the test. On the MMPI, Plaintiff answered in a "highly virtuous fashion." That is to say, she tried to "present herself in a favorable light—but in doing so, she works against the goal of documenting mental health problems to support her disability appeal." Nevertheless:

> ... Persons with her profile tend to be aloof and private; she likely is overly suspicious of others and tends to externalize blame. She may be very sensitive, alienated and lonely. She is inclined to view the world as a threatening place. She likely feels intimidated by others and may overreact to imagined threats. As a result, she tends to approach social relationships with caution and skepticism. She reports a number of concerns and thoughts characteristic of persons with Paranoid Personality features, having a tendency toward suspiciousness, anger and withdrawal—all of which might intensify under stress. In addition, she shows on the profile a number of attitudes and feelings that could interfere with work adjustment.

The Axis I diagnosis was Dysthymic Disorder. Axis II was Personality Disorder NOS, with Borderline, Paranoid, and Dependant features. Tr. at 603. Mr. Porter opined that although Plaintiff would have minimal difficulty remembering and understanding most work instructions, she would likely have trouble with the attention, concentration and pace needed to carry them out, especially when under stress. Mr. Porter wrote:

> It is estimated that she would likely find it hard to interact appropriately with supervisors, co-workers, and the public on a consistent basis, due to her suspiciousness isolation. Her use of good judgment and ability to respond appropriately to changes in the work place are estimated as poor. I think she could easily become pressured in a work setting and as a result, her ability to exercise appropriate judgment may deteriorate.

Tr. at 604.

At the remand hearing, the ALJ called Sanford E. Pomerantz, M.D. to testify as a medical expert. Tr. at 647. Dr. Pomerantz opined that the medical records establish that Plaintiff suffers from recurrent depression which responds to medication and, therefore, does not meet the listing of impairments. The doctor agreed with the psychologist who testified at the first hearing that Plaintiff's symptoms overall were mild or slight, but that there were periods when they were more severe. Tr. at 647. The doctor testified that between August 2001 and May 2004, Plaintiff's mental health problems were not so severe that she would have been prevented from working: "No, probably not I don't think it was that consistent." The doctor opined that there was never a 12 month period of time during which Plaintiff was unable to function. Tr. at 649.

After Dr. Pomerantz testified, the ALJ called Marian Jacobs to testify as a voca-tional expert. In response to a hypothetical questions posed by Plaintiff's counsel and the ALJ, the vocational expert testified that a person of Plaintiff's age, education and past relevant work, who is limited to light work but who was likely to miss work more than three times per month because of mental health problems, would be unable to engage in substantial gainful activity. Tr. at 652–53. The vocational expert testified that if absences were removed from the hypothetical, Plaintiff's past sedentary work could be performed. A third question asked the vocational expert to assume "...trouble carrying out instructions with needed attention and concentration and pace, at times great difficulty doing that ... one third of the time she would have to work at a slow pace." She testified that there would not be any work available to allow such a limitation. Tr. at 654.

## DISCUSSION

Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart,* 457 F.3d 882 (8th Cir.2006.); *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000). Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart,* 465 F.3d 881 (8th Cir.2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart,* 457 F.3d 742, 746 (8th Cir. 2006). We will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Con-

sequently, we may not reverse the decision to deny benefits unless the record contains insufficient evidence to support the outcome. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

*Nicola v. Astrue,* 480 F.3d 885, 886–87 (8th Cir.2007.)

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

The summary of the facts set out above focuses primarily on the opinions rendered by the treating physician, the examining physicians, and the medical advisor who testified at the remand hearing. Nevertheless, the Court has reviewed all of the medical evidence in this case. In the opinion of the Court, the case turns on how the opinions rendered by the various physicians are evaluated. In *Wagner v. Astrue,* 499 F.3d 842, 849 (8th Cir.2007), the Court wrote:

> "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000). " As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Id.* (internal quotations and citations omitted). This court, however, has recognized two exceptions to this general rule:
>
> We have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more through medical evidence, or (2) where a treating physi-

cian renders inconsistent opinions that undermine the credibility of such opinions.

*Id.* (internal quotations, alterations, and citations omitted).

The Court went on cite cases where it was held that the treating physicians' opinions were inconsistent, such as in *Guilliams v. Barnhart,* 393 F.3d 798 (8th Cir. 2005), where the treating physician's report stated that his patient was both totally disabled and should seek vocational rehabilitation.

▮ In the case at bar, Dr. Bernhagen's opinion is consistent throughout: Plaintiff suffers from a chronic form of depression known as Dysthymia; from time to time, she develops a major depressive disorder resulting in a double depression; Plaintiff has a borderline personality disorder; Plaintiff is not able to sustain gainful employment. He rendered this opinion on five different occasions in letters to Disability Determination Services, Plaintiff's counsel, and to the ALJ herself. Dr. Bernhagen's opinion was not contradicted by any other physician. Dr. Peterson, who performed a physical exam, deferred to Dr. Bernhagen's opinion. Mr. Porter, the psychologist, diagnosed Dysthymia and personality disorder with borderline, paranoid and dependent features.

The only evidence which contradicts Dr. Bernhagen's opinion is the testimony of Dr. Pomerantz who has never examined, let alone treated, Plaintiff. In *Brock v. Secretary of Health And Human Services,* 791 F.2d 112, 114 (8th Cir.1986), the Court wrote: "The statements of physicians who never personally examined the claimant but only reviewed the reports of examining physicians, however, do not constitute substantial evidence on the record as a whole. *See, e.g. Van Horn v. Heckler,* 717 F.2d 1196, 1198 (8th Cir.1983)."

■ In the case sub judice, the ALJ improperly discredited the testimony of the treating physician not once but twice. When the case was originally before the Court, the Commissioner acknowledged that the ALJ's decision was deficient. On remand, the ALJ made no effort to find the error confessed by her own lawyers. Rather, the ALJ stated that the Court was "in cahoots or collusion with the General Counsel" when the motion (Tr. at 573–75) was granted. Instead of following the mandate of this Court and the Appeals Council, the ALJ simply repeated the error committed in the first proceeding. Substituting the testimony of a second medical advisor for that of the first did not comply with the instructions of either this Court or the Appeals Council in its remand order. It is the nature of the legal process that lower courts follow the dictates of the higher courts. In *Holst v. Bowen*, 637 F.Supp. 145, 147 (E.D.Wash.1986), the Court wrote:

> The hearing examiner was bound to obey the directions of the mandate without variation; and failure to follow the instructions therein given was error. He failed to follow the instructions of the District Court, and, instead, introduced a mass of evidence with the purpose of holding, contrary to the decision of the District Court, that appellee was not suffering from a heart condition which prevented him from carrying out the work in which he was previously engaged. In so doing, and in creating a new case, the Hearing Examiner committed error.

Judge McNichols continued at 148

> The Supreme Court overrules appellate court decision, not the other way around.... The court of appeals overrules decisions of the trial court, not the

other way around.... And the district court overrules the Appeals Council, not the other way around.... The bottom line is that the ALJ and the Secretary may well be right in their legal analysis. If so, the position will be vindicated upon further appeal. But they are dead wrong in the ill-conceived assumption of a power not properly theirs. (citations omitted)

■ When the vocational expert was presented with hypothetical questions which reflected the restrictions established by Dr. Bernhagen, it was her testimony that no work was possible for plaintiff. Plaintiff proved her case with both medical and vocational expert testimony. As the Eighth Circuit has stated for twenty-one years, "employers are concerned with substantial capacity, steady attendance, and psychological stability." *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980).

During the relevant period of time, Plaintiff was entitled to benefits. A remand for further proceedings, therefore, would only delay the receipt of benefits to which Plaintiff is entitled.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for payment of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See*

---

2. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the gov-

ernment in the case that the applicant alleges were not substantially justified."

also, *Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.