Mary E. ALLEN, Plaintiff,

v.

Michael J. ASTRUE [1], Commissioner
of Social Security, Defendant.

No. 4:06–cv–609 RWP–TJS.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 30, 2008.

ble for their actions by stripping them of the anonymity afforded by modern society'').

**1.** Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

H. Edwin Detlie, Jr., Detlie Law Office, Ottumwa, IA, for Plaintiff.

Maureen McGuire, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Mary E. Allen, filed a Complaint in this Court on December 21, 2006, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits on June 28, 2004. Tr. at 62–64. Plaintiff, whose date of birth is June 10, 1944, was 61 years old at the time of the hearing on November 29, 2005. Tr. at 321. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge (ALJ) Jean M. Ingrasia. Tr. at 317–45. The ALJ issued a Notice Of Decision—Unfavorable on May 18, 2006. Tr. at 13–30. The Appeals Council declined to review the ALJ's decision on October 27, 2006. Tr. at 4–6.

The ALJ proceeded through the steps of the sequential evaluation finding that Plaintiff had not engaged in substantial gainful activity at any time pertinent to the decision, that she has severe impairments which do not meet or equal any of those listed; that she is unable to do her past relevant work given her residual functional capacity for light work; but that she has skills which transfer to other work which exists in significant numbers in the national economy.

Since 1989, Plaintiff worked as a therapist with children who are victims of child sexual and domestic abuse. She also worked with families, and was a clinical supervisor of other therapists. Tr. at 153.

Plaintiff saw Veronica W. Butler, M.D. for a physical examination on November 1, 1999. Tr. at 225–27. After a review of Plaintiff's history and the exam, Dr. Butler opined that Plaintiff met the American College of Rheumatology criteria for fibromyalgia. The doctor wrote that Plaintiff's pain was bilateral and widespread, associated with a number of tender trigger points. Plaintiff's symptoms included sleep disturbance, fatigue, depression, anxiety, and irritable bowel syndrome, all of which are associated with fibromyalgia, according to the doctor. The doctor wrote: "This is a chronic disorder and our goal will be to minimize disability. She would benefit from slower paced work with frequent breaks for stretching, intermittent periods of rest." The doctor noted that Plaintiff was being treated for anxiety and depression by a psychiatrist, but that adequate treatment had not been attained. Tr. at 226. Dr. Butler is Plaintiff's treating physician and her treatment notes span a period between November 1, 1999 and November 11, 2004. Tr. at 185–250.

After a physical examination on September 28, 2004 (Tr. at 163–66), Allan E. Peterson, M.D. diagnosed anxiety/depression. Dr. Peterson opined that this was Plaintiff's most distressing problem. He also diagnosed irritable bowel syndrome which becomes worse with stress—at least six stools a day.

Plaintiff's treating psychiatrist is Ronald R. Berges, D.O. Plaintiff saw Dr. Berges the first time on October 18, 2002. Tr. at 283–85. Plaintiff had been referred on the insistence of a friend. Plaintiff reported that she was being treated with Celexa and Trazodone, prescribed by Dr. Butler. Tr. at 283. Plaintiff's education included a masters degree in counseling. She was working as a clinical supervisor, involved with treatment of mentally ill and mentally retarded clients. Plaintiff had been married and divorced three times. Among Plaintiff's children are two daughters who have a history of depression. Plaintiff reported that her second marriage was to "a wonderful man" who she divorced during a depressive episode. Plaintiff also reported that her brother is being treated for depression. On mental status exam, Plaintiff's mood was dysthymic and her affect was restricted with some animation. Plaintiff's concentration was good. Plaintiff reported physical symptoms of anxiety including restlessness and gastric upset. On Axis I, the diagnosis was depressive disorder, not otherwise specified, rule out major depression. Tr. at 284. Dr. Berges' treatment notes are in the record at 252–85. When she was seen on December 9, 2002, Plaintiff reported that since May, she would get sick during therapy sessions. Tr. at 282. On February 18, 2003, Plaintiff reported feeling pressure to maintain a certain case load for reimbursement purposes. Tr. at 280. On April 1, 2003, Plaintiff reported that there were six people living in her home, all of whom she was supporting. Among those in her home were her daughter and her three children. Tr. at 279.

On May 13, 2003, Plaintiff and Dr. Berges discussed the stress of Plaintiff's job which involved a case load of 20 significant childhood sexual abuse cases. Tr. at 278. On June 16, 2003, Plaintiff reported that every Monday, as well as some other days, she feels ill depending on her scheduled work for the day. Tr. at 277. On July 14, 2003, Plaintiff said she was considering reducing her hours of work and beginning a part time teaching career at a college. Tr. at 276. On October 13, 2003, the doctor wrote that Plaintiff felt helpless and overwhelmed. "She seems to be burning the candle at both ends. She has very little time for relaxation. She is trying to find additional ways to make an income but is pretty much stuck with where she is at." Tr. at 273.

On December 15, 2003, Plaintiff told Dr. Berges that she had worked out an arrangement with her employer in which she would not be spending all her time in direct patient care. Plaintiff was pleased and thought this would reduce her stress. Tr. at 270. On January 26, 2004, Plaintiff reported that she was behind on paper work because the fibromyalgia prevented her from typing fast. She had requested being allowed to dictate, but had been denied. She was considering a workers compensation claim. Tr. at 269.

On February 23, 2004, Plaintiff's mood was dysthymic and her affect was restricted. She was less conversive than usual. Dr. Berges decided to reduce her work schedule to three days per week to see if this would help her reduce her morning nausea. Tr. at 268. On March 22, 2004, Plaintiff told Dr. Berges that she had been unable to reduce her work days. On this occasion the doctor described Plaintiff's concentration as fair. Tr. at 267. On May 10, 2004, Plaintiff reported that she had been able to reduce her work to three days each week, and that she felt better as a result. Tr. at 266.

On June 1, 2004, Dr. Berges wrote that Plaintiff continued to be on a restricted work schedule, but felt that she needed to return to full time. Although she had done well on three days, she tended to decompensate as the days were increased.

"If she has too much stress she becomes violently ill with significant nausea and vomiting." Dr. Berges cautioned Plaintiff about the likely danger of relapse with increasing her work load. Plaintiff said that she had been reprimanded for being behind on her documentation. Tr. at 265. On June 14, 2003, Dr. Berges wrote that Plaintiff's return to five day work weeks was not going well. "She has had increased irritable bowel syndrom type symptoms. She has had increasing chest pressure and is throwing up more." Plaintiff's concentration was "somewhat impaired," and she was having episodic crying spells. Tr. at 264. On June 28, 2004, the doctor wrote that Plaintiff had decompensated after less than a month of full time work. "She feels highly stressed. She is unable to keep up with the workload. She is unable to tolerate the stress of the job and has had increasing problems with nausea with vomiting occurring at least twice daily." The doctor advised Plaintiff that she needed to be off work. Tr. at 263.

Plaintiff's alleged onset of disability date is July 1, 2004.

On August 16, 2004, Dr. Berges wrote to Disability Determination Services. He wrote that Plaintiff has a significant depressive disorder that had not responded to treatment, and which was chronic and currently unrelenting. "Her prognosis is guarded. I do not expect her to fully return to gainful employment." The doctor wrote:

Her ability to remember and understand instructions, procedures and locations is impaired by her depression. Her ability to carry out instructions, maintain attention, concentration and pace is significantly impaired by her condition. Her ability to interact appropriately with supervisors, coworkers and the public is reasonably intact. Her ability to use good judgment and respond appropri-

ately to change in the work place is also intact.

The doctor concluded his opinion that Plaintiff "is likely disabled with both the physical and mental symptoms of the depressive disorder." Tr. at 261.

On November 11, 2004, after Plaintiff had been denied because it was not expected that her condition would be disabling for at least 12 continuous months (see Tr. at 50), Dr. Berges wrote another letter to Disability Determination Services. The doctor noted that Plaintiff's sixteen year old son had been killed in a motor vehicle accident and this had only worsened her condition. He wrote:

Apparently the unfavorable decision was reached due to the fact she has not been unable to work for at least twelve months due to the effects of her condition. It would be my opinion that her estimated time to return to work will be a minimum of one year and more that likely greater than one year. She continues to have numerous disabling symptoms consistent with her history of depression.

Tr. at 260.

On November 22, 2004, Dr. Berges wrote to a disability claims manager at Prudential Insurance Company of America. The doctor certified that Plaintiff met the Prudential definition of disability. Tr. at 258. The doctor wrote: "It would be my opinion that she is psychiatrically disabled. I've encouraged her to seek Social Security disability as well as it is not likely that she will recover full function at this point." Tr. at 259. On January 7, 2005, Dr. Berges wrote again to Disability Determination Services that Plaintiff "continues to be disabled. She is unable to work at her previous job or at any other menial position for that matter." Tr. at 253.

On June 20, 2005, Dr. Berges wrote to Disability Determination Services again.

The Doctor noted that Plaintiff had not improved, even with aggressive medication management and regular therapy visits. The doctor wrote:

Each time that [Plaintiff] has attempted to return to work or even venture near her workplace, she has become very nauseated, had vomiting, anxiety, etc. She has had substantial insomnia which has been treated with high doses of Ambien and the antidepressant Trazodone. She's also on quite high doses of the antidepressant Lexapro. Her concentration has been so impaired that I have had to add Provigil for this and this has been helpful. Finally lorazepam has been utilized up to three times daily routinely for control of anxiety symptoms. It would be my opinion that she has not improved over the past two years. I would consider her disabled at this point. Please give her every consideration.

Tr. at 297.

Plaintiff was treated for chronic capsulitis from August 24 through October 12, 2005. It appears she was treated with Relafen, a walking cast, and custom made shoe inserts. Tr. at 306.

On November 12, 2005, just prior to the hearing, Dr. Berges wrote that Plaintiff continued to have cognitive impairment with short term memory, poor concentration, lost of motivation, sleep disturbance and low energy level. He repeated that whenever Plaintiff attempted work of any kind, she suffered severe nausea and vomiting. "It is my opinion that she continues to be disabled by this condition." Tr. at 316.

At the hearing of November 29, 2005, after Plaintiff testified, the ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 338. The ALJ asked:

She said abuse therapist, provide therapy to children ages 3 to 18, who had been sexually abused, attend juvenile and district court hearings, provide testimony as an expert witness, provide team for counselors, providing in-home family therapy and foster care services to children and counselors working with children and parents to reunify them or to prevent out-of-home placements. I think that's how she described her work at First Resources Corporation. According to the Social Security regulations, we're looking at an individual closely approaching retirement age, which is an individual between the ages of 60 and 64. And this is regulation 404-15-68 Section 5 on transferability of skills, and it indicates as follows. If you have a severe impairment that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work setting, or the industry. Would this individual have such transferable skills?

Tr. at 339–40. In response the vocational expert pointed to jobs such as information clerk, hospital admitting clerk, and appointment clerk. All of the cited jobs were semi-skilled and had a sedentary exertional demand. Tr. at 340–41. In response to questions from counsel, the vocational expert testified that if Plaintiff were unable to complete an eight-hour work day as a result of her mental impairments, competitive employment would be precluded. Tr. at 344.

## DISCUSSION

Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir.2006); *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000).

Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart,* 465 F.3d 881, 885 (8th Cir. 2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart,* 457 F.3d 742, 746 (8th Cir. 2006). We will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Consequently, we may not reverse the decision to deny benefits unless the record contains insufficient evidence to support the outcome. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

*Nicola v. Astrue,* 480 F.3d 885, 886–87 (8th Cir.2007.)

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

■ In a Social Security disability case, the claimant bears the burden to prove that she has not worked since the alleged onset of disability date because of one or more severe impairments. If the impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation, the claimant must show the inability to perform past relevant work. Although the ALJ determines the claimant's residual functional capacity at the fourth step, at the fifth and final step of the sequential evaluation the burden shifts to the Commissioner to show the existence of jobs that can be performed given the claimant's age, education past relevant work, and residual functional capacity.

In *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote that in a disability case "probably the most important issue is the question of [residual functional capacity]." The Court went on to write: "The [residual functional capacity] that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."

Plaintiff makes four arguments: 1) The ALJ failed to properly credit the opinion of the state agency psychologist that although Plaintiff was disabled, she would improve prior to the required one year period; 2) The ALJ failed properly credit the opinion of Dr. Berges; 3) The ALJ improperly discredited Plaintiff subjective complaints; and 4) that the ALJ improperly allocated the burden of proof at step five of the sequential evaluation.

■ Although the Court agrees with Plaintiff's first three arguments, the case turns on the errors made by the ALJ at step five. In the first place, the ALJ failed to ask the vocational expert a proper hypothetical question. Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. In *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir. 1996), the Court wrote that the question must include those impairments that the ALJ finds are substantially supported by the record as a whole. In this case, the ALJ simply asked the vocational expert to consider an individual with Plaintiff's past relevant work who is limited to light exertional activity. Based on that inadequate description, the vocational expert was asked whether such an individual pos-

sessed transferable skills. The vocational expert was not told that the individual has the list of impairments which the ALJ found to be severe. The vocational expert was not told that, according to the treating physician, every time she goes near a work place Plaintiff begins to vomit violently. It does not require much expertise to know that such a person would not be able to use her acquired skills for substantial gainful activity.

The ALJ's error stems from her underestimation of the effects of Plaintiff's depression, a conclusion she reached after having disregarded the opinions of the physicians. The ALJ found that Plaintiff's is unable to perform highly complex work but is able to perform more than simple, routine, repetitive work. While the evidence supports the ALJ's finding that Plaintiff cannot tolerate the stress of providing therapy to sexually abused children or highly dysfunctional families, substantial evidence establishes that Plaintiff's depression is even more severely restricting. In *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996), the Court wrote: "The Commissioner's determination must be based on testimony and medical evidence in the record. And, as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." Likewise, in *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir.1990), the Court noted that the ALJ had "ignored the law of this circuit, which states that the ALJ must not substitute his opinions of those of the physician." Plaintiff's treating physician stated at least five times that Plaintiff's depression was very severe, and that it was not responding to treatment.

The ALJ disregarded Dr. Berges' opinion, reasoning that while Plaintiff was incapable of her past relevant work, "this does not mean she became incapable of performing less skilled and less stressful work." Tr. at 24. The ALJ went on to write: "There is nothing in the record to indicate that the claimant's mental condition ever deteriorated to the point where she became seriously limited in her ability to function generally." Tr. at 24–25. The Court disagrees. There is something in the record, it is the evidence provided by Dr. Berges. Dr. Berges is the expert in this case. *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995) ("Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it.")

This is not a case where the ALJ made a reasonable choice among differing medical opinions about the consequences of Plaintiff's illness. Dr. Berges' opinion is uncontradicted. It was error for the ALJ to disregard it, and as a result, her decision is not supported by substantial evidence on the record as a whole.

As Dr. Berges points out in his letter of November 4, 2004, Plaintiff's claim was denied at the initial and reconsideration level, based on the incorrect assumption that her illness would respond to treatment within the required 12 month period. Just before the hearing, on November 12, 2005, Dr. Berges wrote that Plaintiff continued to have cognitive impairment with short term memory, poor concentration, lost of motivation, sleep disturbance and low energy level. The vocational expert testified that if Plaintiff is unable to complete an eight hour work day, competitive employment would be precluded. A remand to take further evidence or to correct the ALJ's errors would only result in an unnecessary delay in Plaintiff's receipt of the benefits to which she is entitled. This case, therefore, is reversed and remanded for an award of benefits.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for payment of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."