Diana L. THORSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 3:07–cv–78 RWP–TJS.

United States District Court, S.D. Iowa, Davenport Division.

Sept. 18, 2008.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

Michael DePree, Bowman & DePree, Davenport, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Diana L. Thorson, filed a Complaint in this Court on August 23, 2007, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits November 18, 2005. Tr. at 67. Plaintiff, whose date of birth is November 29, 1958 (Tr. at 67), was 48 years old at the time of her hearing. Tr. at 278. After her application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. The hearing was held January 25, 2007, before Alice M. Jordan (ALJ). Tr. at 274–308. The ALJ issued a Notice of Decision—Unfavorable on March 14, 2007. Tr. at 11–24. The Appeals Council declined to review the ALJ's decision on July 16, 2007. Tr. at 4–6. This action followed.

On June 29, 1988, Plaintiff was admitted to Mercy Hospital in Davenport, Iowa, because of an acute onset of vertigo and nausea which progressed to include left-sided facial numbness, bilateral arm numbness and occasional diplopia[1]. An MRI showed an infarction of the lateral medulla with scattered lesions in the left cerebellar hemisphere. Tr. at 128, 234–35. A report of a consultative examination by Fareeduddin Ahmed, M.D. noted that Plaintiff had given birth to a child about nine months before the stroke. The doctor's impression was right brain stem stroke leading to diplopia, vertigo[2], and ataxia[3]. An Echocardiogram on June 30, 1988 was normal. Tr. at 240–41.

On August 4, 1988, Plaintiff saw Daniel B. Johnson, M.D., of Neurology Consultants, for a follow-up. The doctor opined that Plaintiff was doing "quite well," walking without any assistance. Tr. at 232. Plaintiff was still walking without assistance on October 13, 1988. Tr. at 231. On April 11, 1989, Plaintiff saw Dr. Johnson. Plaintiff reported that about three weeks before, she developed increasing difficulty with gait. At the same time, her eyes

---

1. The condition in which a single object is perceived as two objects. SYN: double vision. Stedman's Medical Dictionary, 27th Edition.

2. A sensation of spinning or whirling motion. Stedman's

3. An inability to coordinate muscle activity during voluntary movement; most often due to disorders of the cerebellum or the posterior columns of the spinal cord; may involve the limbs, head, or trunk. Stedman's

began to bother her more. On examination she had "much wilder nystagmus [4] on left lateral gaze with a very strong rotatory component and she does have a mild left sixth nerve palsy. She does have mild ataxia as well." The doctor opined that Plaintiff had extended her brain stem infarct. Tr. at 228. An MRI of the brain on April 17, 1989, showed no specific abnormality. Tr. at 233.

Plaintiff was hospitalized between November 21 and 23, 2005 with the following diagnoses: Chest pain, noncardiac; elevated liver function tests and hepatomegaly from apparent fatty liver condition; nausea and vomiting; alcohol withdrawal; palpitations without atrial fibrillation. Tr. at 140. On admission, Plaintiff was described as: "[A] 46–year–old Caucasian female with a history of cerebrovascular accident, chronic alcohol use, and cannabis abuse." It was noted that Plaintiff was unemployed, having been fired from a job as a cashier in September 2005. It was also noted that Plaintiff consumed a six-pack of beer each day, and that her history was positive for cannabis abuse. Tr. at 142.

On January 11, 2006, Plaintiff saw Daniel O. Arnold, D.O. She had not been taking her medications for two weeks. Plaintiff's liver enzymes were markedly elevated. Plaintiff reported that she had been decreasing her use of alcohol, but had not quit entirely. The doctor noted that Plaintiff smelled of alcohol. Tr. at 251.

On April 13, 2006, Plaintiff was seen by Judi Deckert, ARNP at a Lipid Clinic for cholesterol management. It was noted that Plaintiff was drinking 5 beers per day. Nurse Deckert wrote: Due to balance does short periods of house hold chores. A review of systems was positive for light headedness, vertigo, frequent headaches, unsteady walk, vision problems, abdominal discomfort, abnormal bruising, hotter or colder than others, flushing, swelling of feet, ankles, and legs, cough depression, mood swings, and loss of appetite. Tr. at 183. Plaintiff was advised on dietary matters and advised to abstain from alcohol. Tr. at 184.

On May 9, 2006, Plaintiff saw Dr. Arnold. The purpose of the visit was to "fill out paperwork for lawyer and disability." Tr. at 263. On May 25, 2006, counsel submitted a residual functional capacity assessment completed by Dr. Arnold. Tr. at 186. The form was designed to address limitations caused by stroke. The doctor stated that he had treated Plaintiff since November 29, 2005, seeing her every three months. Symptoms were identified as: balance problems; poor coordination; weakness; slight paralysis; unstable walking; falling spells; numbness, tingling or other sensory disturbance; pain, at night; fatigue; vertigo/dizziness; headaches; and double or blurred vision/partial or complete blindness. The doctor opined that Plaintiff was not a malingerer. Tr. 187. The doctor said that Plaintiff has significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gate and station. He said that Plaintiff "often" had pain, fatigue or other symptoms severe enough to interfere with attention and concentration. The doctor said that Plaintiff could walk less than a city block, could sit for an hour at a time, stand 30 minutes at a time. He said that in a normal day, Plaintiff could sit and stand about four hours each. Tr. at 188. The doctor said that, if working, Plaintiff would need to take breaks every hour for about 30 minutes. He said that when sit-

---

**4.** Involuntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component. Stedman's

ting, Plaintiff's legs should be elevated level with the body. The doctor stated that Plaintiff would need to use a cane or other assistive device. He said Plaintiff could lift less than 10 pounds occasionally and 10 pounds rarely. He said that Plaintiff has significant limitations in doing repetitive reaching handling or fingering. Tr. at 189. The doctor said that if Plaintiff had a job, she would likely be absent from work more than 4 days each month. When asked to identify any other limitations which would affect Plaintiff's ability to work, Dr. Arnold wrote: decreased vision, decreased balance, and weakness. Tr. at 190.

Plaintiff saw Dr. Arnold on June 1, 2006, to "discuss medications." It does not appear that Plaintiff voiced any symptomatic complaints. Tr. at 270–71.

On September 14, 2006, Plaintiff complained to Dr. Arnold of left leg and arm pain. Plaintiff reported that she had tingling in her left hand and numbness with activity. On physical examination, there was a spot on her deltoid that exacerbates the numbness when palpated. Plaintiff reported that her left leg hurt her at night when she lays on the left side. Tr. at 245. Dr. Arnold diagnosed probable carpal tunnel syndrome. The plan included an EMG. Tr. at 246. If the EMG study took place, the report does not appear in the record.

Plaintiff testified that she was terminated from her last job at a supermarket because of her problem stumbling. Plaintiff was asked if it was due to alcohol or drug usage and she testified that it was not. Tr. at 282. When asked about her daily activities, Plaintiff said that she tries to keep her dishes washed: "I can't stand very long, so I might have to sit down a couple of times. But I try to get at least my dishes done. Pick up a little bit. And a lot of times I do a lot of sleeping because I get tired a lot. I probably sleep more than I'm awake." Tr. at 283–84. Plaintiff

said she does a few chores, naps, watches some TV, and, in the evening, she and her husband together fix a meal. Tr. at 284. Plaintiff testified that her adult daughter and child lives in her home. She was asked if she helped take care of the child: "Oh, no. I wouldn't do that. She's two years old and I wouldn't—with my balance and stuff the way it is I wouldn't be able to, you know, run after her and take care of her. So I wouldn't even try." Tr. at 285. Plaintiff was asked how much alcohol she drinks. She responded that when her son comes over on weekends, they "have a few beers." Tr. at 287.

Plaintiff said that the vision in her right eye is better than in the left, but she would need a magnifying glass to read with the right eye. Tr. at 289. Among Plaintiff's physical limitations, she testified that she is unable to use her right arm and hand because they are numb. She said that she is right handed. Tr. at 293. She said that she also has numbness in her right leg, which contributes to her balance problems. Plaintiff testified that her left arm and leg had been bothering her, but emphasized the problem with her leg. She was not asked about limitations in her left arm and hand. In addition, she still has vertigo and dizziness. Tr. at 295.

After Plaintiff testified, the ALJ called George Paprocki to testify as a vocational expert. Tr. at 297. The vocational expert was asked to assume a 48 year old woman, with an 8th grade education and with Plaintiff's work history. The ALJ limited Plaintiff to sedentary work with occasional limitations to all postural limits—stooping, standing, balancing, kneeling, crouching, crawling. Tr. at 299–300. The vocational expert testified that such a person would not be able to do any of Plaintiff's past relevant work. Tr. at 300. He went on to testify, however, that other jobs, such as auction clerk, check cashier, parking lot

cashier, and survey worker would be able be performed. Tr. at 300–01. He said that a problem with depth perception would not have an effect on the ability to do the jobs. Tr. at 301. When counsel asked the vocational expert to consider the limitations provided by Dr. Arnold, the vocational expert testified that no work would be possible. Tr. at 303–05.

On January 25, 2007, counsel wrote to Dr. Arnold. Counsel pointed out that on the last page of his assessment, Dr. Arnold responded that his comment about Plaintiff's ability to tolerate work stress was based on his discussion with his patient. Counsel asked the doctor to state whether the remainder of his opinion was based on Plaintiff's responses, or if his opinion was based on the doctor's knowledge of her condition. The doctor responded with a hand written note: "Based on my discussion with patient, she can tolerate moderate work stress. This may include employee/employer interaction, employee/public interaction, phone duties, etc. Would avoid stresses of increased standing and walking. Would avoid duties such as assembly work." Tr. at 273. Although the letter was not responsive, counsel submitted the letter to the ALJ on February 15, 2007, and stated his belief that the record was complete. Tr. at 272.

In her decision, the ALJ found that Plaintiff does not have a severe mental impairment, including substance abuse disorder. The ALJ found that Plaintiff has a residual functional capacity consistent with her first hypothetical question to the vocational expert. Tr. at 18. The ALJ wrote that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the symptoms was "not entirely credible." Among the reasons given for finding her less than credible, the ALJ pointed to

Plaintiff's "relatively active lifestyle," the failure to obtain an eye examination, watching TV for 2 or 3 hours per day, not using a cane indoors, the ability to use stairs as long as there is a hand rail, and her testimony that she performed some household chores. Tr. at 21.

The ALJ did not grant controlling weight to Dr. Arnold's opinion regarding Plaintiff's residual functional capacity "because the degree of limitation is not consistent with the record as a whole." Tr. at 22. The ALJ found that Plaintiff is unable to do her past relevant work (Tr. at 22), but that she could do the type of work cited by the vocational expert. Tr. at 23. The ALJ found that Plaintiff is not disabled and not entitled to the benefits for which she applied. Tr. at 24.

## DISCUSSION

Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart,* 457 F.3d 882 (8th Cir.2006); *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000). Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart,* 465 F.3d 881 (8th Cir.2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart,* 457 F.3d 742, 746 (8th Cir. 2006). We will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Consequently, we may not reverse the decision to deny benefits unless the record

contains insufficient evidence to support the outcome. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

*Nicola v. Astrue,* 480 F.3d 885, 886–87 (8th Cir.2007.)

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

For reversal, Plaintiff argues that the ALJ's residual functional capacity finding is not supported by medical evidence. Among other things, Plaintiff argues that the ALJ erred by failing to obtain medical evidence of Plaintiff's visual impairment and impairment of her right arm. While the Court agrees that the record is not fully developed and that the case must be reversed and remanded, more must be said.

It is well settled law that an ALJ has a duty to fully and fairly develop the record, even when the claimant is represented by counsel. *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983). In *Warner,* the ALJ recognized the importance of a proper assessment of a memory impairment and stated on the record that if objective evidence was not found in the record to support the impairment, a consultative examination would be ordered. Because the ALJ failed to obtain the examination, the Court of Appeals held that the Secretary had not sustained the burden to show that the claimant retained the residual functional capacity to engage in other work. *Id.* Furthermore, the Court held that the record did, in fact, have medical evidence of the impairment in the form of an affidavit from a physician. The case was reversed and an award of benefits was ordered. *Id.* at 432.

The ALJ's duty to fully and fairly develop the record, however, does not relieve the claimant's lawyer of the duty to assist his or her client to obtain the benefits applied for. In *Onstad v. Shalala,* 999 F.2d 1232, 1234 (8th Cir.1993), Chief Judge Richard S. Arnold, wrote: "While the ALJ has a duty to develop the record fully and fairly, *Driggins v. Harris,* 657 F.2d 187, 188 (8th Cir.1981), even when a claimant has a lawyer, it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about."

Plaintiff points to the ALJ's failure to develop the record regarding a visual impairment. Counsel, however, did not submit any records from an eye doctor, nor did he arrange for a consultative examination. He did not even request that the ALJ obtain such an examination. This was after the ALJ indicated that the only visual impairment she would find was the lack of depth perception. After the hearing was over, the record remained open for the procurement of additional medical records. Had counsel requested the time to obtain an eye examination and been denied, a claim of error would have been appropriate. Counsel, however, indicated that the record was complete and ready for decision. Tr. at 272 ("I believe this [a response to a letter to Dr. Arnold] completes her file."). In *Maes v. Astrue,* 522 F.3d 1093, 1097 (10th Cir.2008), the Court wrote:

Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation. *See Branum v. Barnhart,* 385 F.3d 1268, 1271–72 (10th Cir.2004) (concluding that the ALJ satisfactorily developed the record when the claimant's

"counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records"). **To do so would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record.** *Citation omitted.* **This is especially true where, as here, neither counsel nor the claimant have obtained (or so far as we can tell, tried to obtain) for themselves the records about which they now complain—suggesting that counsel has abandoned his role as advocate in favor of relegating that responsibility to the ALJ**[footnote 1.] In short, we will not ordinarily reverse or remand for failure to develop the record when a claimant is represented by counsel who affirmatively submits to the ALJ that the record is complete. This is particularly the case when the missing medical records are not obvious from the administrative record or otherwise brought to the attention of the ALJ. Because the records' existence and significance were not brought to the attention of the ALJ and counsel affirmatively indicated the record was complete, the ALJ did not have a duty to obtain Dr. Kimball's records.

Footnote 1: Other courts refuse to reverse or remand in such a case because the claimant is unable to show how the failure to obtain the records was prejudicial. *See, e.g., Shannon v. Chater,* 54 F.3d 484, 488 (8th Cir.1995). This Circuit, however, has not grafted an element of prejudice onto the governing analysis. **bold emphasis added.**

In *Martin v. Apfel,* 983 F.Supp. 812, 815 (S.D.Iowa 1997), this Court wrote that a Social Security proceeding is not a game of cat and mouse. People who apply for disability benefits desperately need the assistance provided for in the Act. They seek the services of skilled attorneys who will assist them in obtaining the evidence to prove their disability claim. It is often necessary for the attorney to obtain medical records, opinion letters from physicians, and consultative examinations to support claims of disability. This often involves the expenditure of the lawyer's funds. If, however, the lawyer is confident that his client is disabled and entitled to benefits, it will be money well spent and can be recovered when past due benefits are secured. To do nothing except show up at the hearing and, afterwards, find error in the ALJ's decision with the expectation of collecting an attorney fee, falls wide of the mark of effective advocacy on behalf of one's client.

▬ The record does not contain substantial evidence to determine if Plaintiff has, or does not have, the ability to see well enough to do the sedentary jobs cited by the vocational expert. The vocational expert concluded his testimony by saying that the cited jobs require close acuity on a frequent basis, and that vision would need to be better than what Plaintiff testified is the situation with hers. The case turns, therefore, on a proper assessment of Plaintiff's ability to see. An eye examination would provide evidence of Plaintiff's visual acuity and its ability to be corrected well enough to work. Furthermore, if Plaintiff is unable to effectively use her arms and hands, she should provide evidence to support her claim.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. A remand to take additional evidence is necessary.

The final decision of the Commissioner is reversed and remanded to the Commissioner for further action and a new decision consistent with this Opinion.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[5]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005). In this case, counsel for Plaintiff, as well as counsel for the Commissioner, will be expected to brief the issue of whether the Court can hold the position of the Commissioner "not substantially justified," in light of the counsel informing the ALJ that the record was complete and ready for decision.

IT IS SO ORDERED.

---

**5.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."